UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

PRINCETON S. VALLO #490191  CIVIL ACTION NO. 18-cv-1341

VERSUS  JUDGE FOOTE

STEVE PRATOR, ET AL  MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Princeton Vallo ("Plaintiff") is a self-represented prisoner who filed this civil rights action against Sheriff Steve Prator and several of the corrections officials and medical personnel employed at the Caddo Correctional Center ("CCC"). Plaintiff alleged that he was subjected to excessive force on more than one occasion and not afforded proper medical care for his injuries. Before the court is a Motion for Summary Judgment (Doc. 42) filed by Defendants. For the reasons that follow, it is recommended that the motion be granted.

**Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict

for either party.  Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986).  If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

**Convicted Prisoner or Pretrial Detainee**

Neither Plaintiff's filings nor Defendants' motion for summary judgment appear to establish whether Plaintiff was a pretrial detainee or convicted prisoner at the time of the incidents. That is relevant because the claims of a convicted inmate are governed by the Eighth Amendment and the claims of a pretrial detainee are governed by the Due Process Clause.  Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015); Baughman v. Hickman, 935 F.3d 302, 306 (5th Cir. 2019) ("The Eighth Amendment ensures the safety of convicted prisoners while due process under the Fourteenth Amendment protects pretrial detainees.").

It appears that Plaintiff was a convicted prisoner at the relevant times.  A published decision in a wrongful death action states that Plaintiff was in prison serving an 11-year sentence when his son was born in 2010, and he remained in prison in 2016 when his son died in an accident.  Myles obo Myles v. Howell, 277 So.3d 1218 (La. App. 2d Cir. 2019). The offenses at issue in this case happened soon afterward in 2017 and 2018.  Those facts,

together with Plaintiff's occasional transfers to other detention facilities and his invocation of the Eighth Amendment in his pleadings, suggest that Plaintiff was a convicted prisoner at the time of these events. Accordingly, his claims will be assessed under the Eighth Amendment.

**Excessive Force**

Plaintiff asserts claims of excessive force. Whether an Eighth Amendment excessive force claim has been made out depends on whether the "force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 112 S.Ct. 995 (1992). Though the focus of the standard is on the official's subjective intent to punish, that intent is determined by reference to factors set forth in Hudson to determine whether the use of force was constitutionally permissible. Those factors are: (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible official, and (5) any efforts made to temper the severity of a forceful response. Cowart v. Erwin, 837 F.3d 444, 452-53 (5th Cir. 2016); Waddleton v. Rodriguez, 750 Fed. Appx. 248, 253 (5th Cir. 2018).

**Denial of Medical Care**

Plaintiff also alleges that CCC officials denied him appropriate medical care after he was subjected to excessive force. The Eighth Amendment rights of prisoners are violated when prison officials demonstrate deliberate indifference to serious medical needs, which constitutes an "unnecessary and wanton infliction of pain." Estelle v. Gamble, 97 S.Ct. 285, 291 (1976). A serious medical need is "one for which treatment has

been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n. 12 (5th Cir. 2006). Deliberate indifference will be found only where the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 114 S.Ct. 1970, 1984 (1994). Neither unsuccessful medical treatment, mere acts of negligence, nor medical malpractice give rise to deliberate indifference. Gobert, 463 F.3d at 346.

**Qualified Immunity**

Each of the individual defendants challenges the claims directly and asserts a defense of qualified immunity. When evaluating qualified immunity, the court must ask whether the facts, when taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right that was clearly established at the time. Valderas v. City of Lubbock, 937 F.3d 384, 389 (5th Cir. 2019).

The qualified immunity defense alters the usual summary judgment burden of proof. The court still views the evidence in the light most favorable to the plaintiff, but the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity. Id. To do so, the plaintiff need not present absolute proof, but he must offer more than mere allegations. Id. Also, it is improper to analyze a group of defendants' actions collectively in assessing qualified immunity. Each defendant's entitlement to immunity must be examined separately. Meadours v. Ermel, 483 F.3d 417, 421-22 (5th Cir. 2007).

**Emergency Response Team**

Some of the encounters of which Plaintiff complains involved interaction with CCC's Emergency Response Team ("ERT"). Sgt. Kris Hill testified in an affidavit about how prisoners are housed and the role of the ERT. He explained that CCC houses approximately 1,500 inmates in housing units that use a direct supervision method. One or two unarmed deputies supervise inmates in a housing unit that includes pretrial detainees and convicted felony inmates. The ERT is three to five officers who are in a central location and respond to the different housing units, or pods, when inmates are noncompliant or there is a disturbance.

Sgt. Hill, who is responsible for training the ERT members, described the approximately 50 hours of training, which includes defensive tactics and cell extraction instruction. Members are taught that it is important to gain compliance quickly, and the safest position of the inmate who is resistant is on the ground as opposed to upright. Officers are taught techniques to place the inmate on the ground quickly, and they are instructed in techniques, including fist strikes, that may be appropriate to gain compliance. The primary target of the strikes is to be large muscle groups as opposed to the inmate's face, with the face to be struck only if believed necessary under unique circumstances.

Sgt. Hill testified that Plaintiff has, on numerous occasions, been classified as a Level II inmate who required precautions due to his violence and potential violence. His behavior has sometime improved so that he was returned to the general population, but he would then return to Level II classification. Inmates classified as Level II must be restrained when out of their cell. If the inmate is to leave his cell, he is directed to place

his hands through the tray hatch to be handcuffed to the cell door. The door is then opened for the application of leg irons. Officers are instructed to call the ERT if an inmate does not comply with those commands.

**October 16, 2017**

    **A. The Allegations**

Plaintiff alleged in his complaint (Doc. 5) that on October 16, 2017, Officers Pye, Pinesett, Morris, Porter, and Frizzell ran into his cell and attacked him without complying with their procedures of setting up a video camera and giving him first, second, and third level commands. Plaintiff alleged that he suffered multiple blows to the head and that officers continued to punch him in the head and ribs, even after he was handcuffed, until he was knocked unconscious. The officers then woke Plaintiff with even more punches. Plaintiff complained that he was eventually taken to the infirmary but not afforded adequate medical treatment, such as checking his vital signs or testing for concussion. Plaintiff alleged that Officer Morris, while Plaintiff was handcuffed and on his knees, subjected him to a second beating by punching Plaintiff in the face "well over 20 times" and fracturing his ribs. Plaintiff alleged that he was again taken to the infirmary, but he was given only a single generic Motrin.

    **B. Defense Evidence**

Defendants offered the affidavit of Deputy Reginald Morris in response to these allegations. Morris testified that, as a member of the ERT, he has responded to multiple requests for assistance in containing Plaintiff. The ERT was called to the mental health housing unit on October 16, 2017 for an incident involving Plaintiff. On arrival, Morris

saw Plaintiff inside his cell, kicking and beating on the door. Plaintiff was not wearing wrist or leg restraints. The ERT intended to spray Plaintiff with pepper spray to gain compliance, but Plaintiff placed his bed against the door to block access through the tray hatch. This required the team to enter the cell and attempt to gain compliance.

Morris testified that the ERT lead ordered Plaintiff to get on the ground and put his hands behind his back. Plaintiff refused and took a defensive stance with his boat bed positioned in front of him. The ERT opened the door, entered the cell, and used soft pads against the boat bed. Morris testified that Plaintiff attempted to grab Morris' leg and take him to the ground, which caused Morris' MEB (baton) to fall out of his holster. In an effort to prevent Plaintiff from grabbing the baton, Morris applied two distractionary strikes to Plaintiff's face. Morris testified that the only other force used by the officers were distracting strikes to large muscle groups and "soft empty hand" techniques, meaning grabbing the inmate. When Plaintiff released Morris' leg, he was immediately placed in wrist restraints and later escorted to medical, where he was cleared. Photographs of Plaintiff were taken.

Defendants submit medical records from the date of the incident. The notes reflect that Plaintiff, who yelled and cursed during the evaluation, reported left side rib pain and left side face pain. There were no other obvious injuries. Plaintiff wanted only a single dose of ibuprofen and "no prescription." The notes indicate that Plaintiff wanted only one pill at a time so that he would not be charged. A mobile x-ray on October 16, 2017 of multiple views of the left ribs did not show any underlying fracture, lesions, or other abnormality. The reviewing physician wrote in a report that there was no bone or soft-

tissue damage to the facial bones. Another x-ray report from October 17, 2017 of two views of each ankle did not show any evidence of fracture, dislocation, or swelling. Two views of the left hand also showed no evidence of fracture or dislocation. A photograph taken of Plaintiff after the extraction shows him from the chest up. He has several red marks on his chest and shoulder area, plus what appear to be bumps and redness on his forehead.

    Defendants also submitted surveillance video from the housing unit that recorded the extraction with a camera positioned outside the cell. There is no audio on the recording. It shows five officers approach the cell and encounter a large object blocking the window of the cell. An officer opened the door, and the ERT entered, with the first officer using large red pads to clear the way. The officers immediately began to grapple with Plaintiff inside the cell. What happened inside the cell is not clearly visible, but officers soon wrestled Plaintiff outside the cell. One of the officers, presumably Morris, picked up a baton from the floor and tossed it to a nearby officer who was not involved in the extraction. The officers threw several punches, with one officer throwing more than a dozen, before Plaintiff's hands could be forced behind his back and handcuffs applied. The punches stopped immediately after the handcuffs were secured. Two officers then each used an arm to hold Plaintiff down on the ground for about two minutes, during which time Plaintiff once attempted to get up. Plaintiff was led away out of camera range. Defendants have not offered a recording, if any exists, of what happened after Plaintiff was escorted from that area and taken to the infirmary.

### C. Plaintiff's Opposition

Soon after the motion for summary judgment was filed, Plaintiff requested an extension of time and other relief based on a recent transfer to a new corrections facility and a lack of paper and other legal resources. The court directed the clerk of court to mail Plaintiff a copy of a recent memorandum order that had been mailed to his earlier address, and the court extended the deadline for Plaintiff to file any opposition to the motion for summary judgment. Doc. 46.

Plaintiff later responded that he was without his discovery materials because he left them behind when he was working out of state. He complained that a DVD of the surveillance videos would not play in his grandmother's DVD player. The court ordered defense counsel to mail another copy of the earlier discovery responses to Plaintiff and advised Plaintiff that he would likely need a computer to view the video evidence. Plaintiff did not request a second extension of the briefing deadline, but the court sua sponte afforded him another extension of time. Doc. 50.

Plaintiff later complained again about a lack of certain materials. The court ordered defense counsel to mail Plaintiff a copy of the CCC use of force policy that was in effect at the relevant time, and the clerk of court was directed to mail Plaintiff a copy of the motion for summary judgment and supporting materials. Plaintiff had already filed one memorandum in opposition to summary judgment, but the court afforded him a final extension of time to do so with the benefit of the additional materials. Doc. 55. Plaintiff did not file another memorandum.

The only memorandum (Doc. 52) filed by Plaintiff in response to the motion complained about the lack of production of the use of force policy (which was ordered mailed to Plaintiff), argued that the surveillance video would establish Eighth Amendment violations, and argued that the defendants and other CCC officials were "in cahoots with the coverup" of the assaults. Plaintiff repeated his allegations that, after he was taken from the cell, he was taken upstairs to another area and beaten until his face and ribs were cracked. He complained that the defense did not provide him with the photographs and x-rays, but shortly before the opposition was filed the court ordered those materials be printed and re-mailed to Plaintiff.

**D. Analysis**

Plaintiff's opposition includes several allegations, but it is not supported by any competent summary judgment evidence. Defendants met their burden by squarely challenging Plaintiff's allegations, which shifted the burden to him to create a genuine dispute of material fact. Plaintiff's three-page unsworn memorandum is not sufficient to do so. Larry v. White, 929 F.2d 206, 211 n. 12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence.")

The Fifth Circuit affirmed summary judgment for the defendants in a similar setting in Jones v. Anderson, 721 Fed. Appx. 333 (5th Cir. 2018), where a prisoner alleged excessive force by a correctional officer. The officer moved for summary judgment and supported his motion with an affidavit that denied the use of excessive force and attached medical and other supporting records. The prisoner responded that credibility assessments and choices between the conflicting versions of events should be decided by a jury, but he

did not submit any competent summary judgment evidence. The district court granted summary judgment for the defendant, and the appellate court affirmed. Summary judgment was also affirmed in a similar case that arose from this court, where the only competent evidence came from the defendants. Turner v. Baird, 707 Fed. Appx. 290 (5th Cir. 2017) ("Even pro se litigants may not oppose summary judgment motions with unsworn materials.").

The summary judgment record before the court shows that there was a significant use of force, but it was in response to repeated failures to obey orders and be handcuffed. The officers did hit Plaintiff several times after they were required to enter his cell, but they ceased doing so immediately once Plaintiff complied and placed his hands behind his back. The medical records indicate that, despite the force used, Plaintiff was not seriously injured. The x-rays in particular do not support Plaintiff's allegations that he suffered broken ribs or other fractures. The Hudson factors do not support a finding of excessive force under these circumstances. There was a need for the application of force, a reasonable amount of force was applied given Plaintiff's background and the threat he posed to the safety of the officers, and efforts to temper the severity of the response by using a chemical agent were thwarted by Plaintiff blocking his tray hatch. An assessment of these factors indicates that the force was applied in a good-faith effort to maintain or restore discipline, and not maliciously or sadistically to cause harm.

The medical records and other evidence indicate that Plaintiff was afforded prompt and reasonable medical attention after the cell extraction. He was given anti-inflammatory medication, and x-rays were taken to ensure that there were no fractures. These facts do

not suggest deliberate indifference to a serious medical need. Plaintiff may have disagreed with the particular treatment he was afforded, but such disagreements do not state a constitutional claim for indifference to medical needs. Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997). Defendants are entitled to summary judgment with respect to all claims based on the October 16, 2017 events.

**January 19, 2018**

Plaintiff made a brief allegation on page six of his complaint that he was beaten on January 19, 2018. No details were alleged. Defendants challenged any claim arising on that date with the affidavit of Deputy Jeremy Draper. He testified that, as a member of the ERT, he was called to the housing unit and told by the supervising deputy that Plaintiff was losing the remainder of his recreational time due to an incident. Deputy Draper testified that he explained the situation to Plaintiff, who became argumentative. Draper told Plaintiff to calm down and keep his hands down, but Plaintiff did not comply. Draper grabbed Plaintiff by his jumpsuit and attempted to escort him to his cell.

Draper testified that Plaintiff actively resisted by grabbing his cell door handle and dropping his body weight to the floor. Draper attempted to gain compliance, and Plaintiff tried to bite him. Draper then delivered several closed-fist strikes to Plaintiff's face in an effort to free himself and prevent Plaintiff from biting him. Plaintiff also wrapped his leg restraints around Draper's legs, which prevented Draper from getting off the ground. Plaintiff refused to comply with several loud commands to release Draper's legs, so Draper used his taser to fire probes into Plaintiff's arm. Once Draper gained compliance, Plaintiff was assisted to his feet and escorted to medical.

A video recording of the incident is consistent with Draper's description, although the details of the encounter are difficult to discern. It is plain that Plaintiff resisted efforts to put him in his cell, and the two men ended up wrestling on the floor for about 45 seconds, during which time Plaintiff can be seen using his legs to attempt to control Draper. No force was applied once Plaintiff complied, and he was soon escorted from the area. Deputy Draper attached photographs of Plaintiff that were taken after this incident. They depict small wounds on Plaintiff's right arm where the taser was applied, as well as mild redness on Plaintiff's left neck area.

Plaintiff's memorandum in opposition (Doc. 52) discussed the other use of force incidents, but it did not mention this January 19, 2018 encounter. Deputy Draper and the other defendants are entitled to summary judgment with respect to all claims based on the January 19, 2018 incident. The competent summary judgment evidence shows that there was a definite need for the application of force when Plaintiff physically resisted returning to his cell and then actively wrestled with and tried to bite a deputy who attempted to gain compliance. The deputy struck Plaintiff a few times, which did not end Plaintiff's resistance, and applied a taser that apparently achieved compliance and left a small wound.

There is no evidence to indicate that the force used was employed maliciously and sadistically to cause harm. Rather, under the uncontested facts, the force was applied in a good faith effort to restore discipline after Plaintiff forcefully resisted valid orders. Plaintiff made no specific allegations that medical care was denied in connection with this incident, and the summary judgment evidence stated that Plaintiff was escorted to medical

immediately after the incident.  Summary judgment is, therefore, appropriate with respect to all claims arising from this incident.

**February 4, 2018**

    A.  **The Allegations**

Plaintiff alleged in his complaint that family members drove from Dallas to visit him on February 4, 2018.  Plaintiff alleged that Officer Morris decided to "stalk" his visit by standing nearby and making him feel uncomfortable.  Plaintiff told his visiting aunt that Morris was the once who punched him in his face several times while wearing a pinky ring.  The officers ended the visit after 15 minutes, but Plaintiff argues that the rule book stated that out-of-state visitors were entitled to 30 minutes.  Plaintiff alleged that when he made inquiry to the deputy, the same deputies who beat him on a prior occasion tackled him as he was on his knees, banged his head on the wall, and Officer Porter began punching him in the ribs repeatedly.

    B.  **The Evidence**

Defendants offered the affidavit testimony of Deputy Morris in response to these allegations.  Morris testified that he and two other deputies from the ERT responded to the visitation area.  They were called because Plaintiff refused to return to his cell after a deputy told him that his visitation was over and it was time to return to his cell.  Morris testified that an ERT deputy gave Plaintiff loud commands to get on the ground, and Plaintiff did not comply.  The deputy grabbed Plaintiff's jumpsuit and torso and quickly placed him on the ground.  Morris said this quick action was taken because of Plaintiff's known violent nature and in an effort to maintain safety of the inmate and the deputies.  He noted that

ERT members were taught that the safest way to control an inmate is to place him on the ground as quickly as possible, and inmates are taught to get on the ground whenever ERT responds.

Morris testified that, once Plaintiff was on the ground, he was told to get on his stomach and put his hands behind his back. Plaintiff did not comply. Deputy Porter then administered distractionary strikes to Plaintiff's ribcage in an attempt to gain compliance. Morris withdrew his taser from his holster, but the deputies gained compliance before the taser was needed. Plaintiff was escorted to medical and cleared. Deputy Morris attached a photograph of Plaintiff that was taken after the incident. It shows Plaintiff facing the camera with the backs of his hands on display. It appears that Plaintiff had a band-aid on the left side of his face, but no other injuries are apparent in the color photograph.

Defendants submitted surveillance video of the visiting area from two cameras. The visitor and inmate sat facing each other at tables, separated by glass, and they spoke by telephone. One camera was positioned behind Plaintiff, and the other was on the visitor's side of the glass. The recordings show Plaintiff sitting in a chair visiting with a female visitor. An officer can be seen standing near the edge of the area captured by video. He appears to be supervising the room. Plaintiff turned to the officer on occasion, speaking and motioning. Plaintiff hung up the phone and began to gather his papers, as if the visit were ending, but he then stopped and continued to attempt to speak to the visitor through the glass and gestured to her with his hands. The officer in the room appeared to use his radio, and three other officers soon entered the visiting room. The first of them grabbed Plaintiff (who was standing, not on his knees as he alleged) and immediately threw him to

the floor in a corner. Three officers then converged on Plaintiff and bent over him, consistent with attempting to handcuff him. One of the officers appeared to deliver two strikes with his left hand, but no other punches are clearly depicted. The officers soon stood plaintiff up, handcuffed behind his back, and escorted him from the room.

### C. Analysis

Defendants are also entitled to summary judgment with respect to any claims based on these events. The summary judgment evidence reflects that Plaintiff refused to return to his cell after he was told his visitation was over. The surveillance video showed that the visitor hung up the phone, and plaintiff did too, but Plaintiff then continued to try to talk to the visitor. The video also showed that he had what appeared to be a less than amicable discussion with the supervising officer. The ERT then responded and quickly applied force to get Plaintiff on the ground and in handcuffs within less than a minute. Once Plaintiff was handcuffed, the use of force stopped, and he was escorted from the area.

Defendants met their summary judgment burden with respect to this incident. "When a moving party has met its Rule 56 (c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones, 721 Fed. Appx. at 335, quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010). Considering the relevant Hudson factors and the lack of competing evidence, Plaintiff has not created a genuine dispute of material fact on an Eighth Amendment claim based on this incident. Defendants are entitled to summary judgment with respect to all claims based on the February 4, 2018 events.

**Conclusion**

Plaintiff alleged that he was subjected to excessive force and denied proper medical care. Defendants moved for summary judgment and supported the motion with affidavits, medical records, and surveillance video that support their entitlement to summary judgment under the applicable constitutional standards. Plaintiff was afforded multiple opportunities to respond to the motion. He did so, but his response is not sufficient to create a genuine dispute of material fact with respect to any claim. All defendants are entitled to summary judgment with respect to all claims asserted in the complaint.

Accordingly,

It is recommended that Defendants' Motion for Summary Judgment (Doc. 42) be granted and that all claims against all defendants be dismissed with prejudice.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to

proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of November, 2019.

_____
Mark L. Hornsby
U.S. Magistrate Judge